UNITED STATES FEDERAL DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

**YUSUF J. NURALDIN,** pro se, and/or with standing, and/or in his capacity
as a private attorney general, prosecutes this Civil Rights Action/Indictment
on behalf of himself, on behalf of The People of The State of New York, and,
on behalf of all similarly situated employee ZEBRA TEAM Members/Associates
(1st Amendment Association Rights, with) Anthony Farella, Sr; Police Officer
& a part-time Centro employee; Mrs. Felicia A. Townsend, and, on behalf of
U.S. Commissioner EDWARD GARROW, Mediator, of the Federal Mediation
& Conciliation Service ("FMCS").



U.S. DISTRICT COURT - N.D. OF N.Y.
**FILED**
FEB 15 2008
AT_____ O'CLOCK_____
Lawrence K. Baerman, Clerk - Syracuse

                                                Plaintiff

                    -against-

                                        **-AMENDED COMPLAINT-**

                                        **CIVIL ACTION NO:** 07-CV-1108
                                        JURY TRIAL DEMANDED


CENTRAL NEW YORK (CENTRO) REGIONAL TRANSPORTATION AUTHORITY DEFENDANTS:
**BOARD OF DIRECTORS** ("BOD"): ROBERT COLUCCI (Chairman, "BOD"); BRIAN M. SCHULT
Vice Chairman "BOD"); H.J. HUBERT (Treasurer); G. JOSEPH CHALIFOUX (Member); NICHOLAS F.
LAINO (Member); VINCENT A. O'NEIL (Member); DARLENE D. LATTIMORE (Secretary);
DERAUX L. BRANCH (Member); MARY DAVIS (Advisor);

WARREN FRANK (Former C.E.O.); JOSEPH CALABRESE (Former C.E.O.); FRANK KOBLISKI
(Present, C.E.O.); JOHN RENOCK (SENIOR Vice President Operations); JOE DEGRAY (Vice President
of Operation); RICHARD (RICK) LEE (Vice President of Human Resources) STEVE SHARE (Vice
President of Finance)

- GARY NORDHEIM (Employee Relations Manager);
- JACKIE MUSENGO (Benefits Manager),
- AUDREY TUCKER (Light Duty Coordinator);
- LEO WILLIAMS (Lead Outside Supervisor);
- DAVE MIX (Supervisor);
- DUKE BAILEY (Supervisor);
- ANGELA GHOLSTON (Supervisor)
- DARRYL VANDERPOOL (Outside supervisor);
- ELIZABETH UNISLAWSKI (Personal secretary of Senior V. P. John Renock)
- PATTY DISHAW (Manager Service Development);
- JOE SPERATO, (Dispatch Supervisor)
- CRAIG WILLIAMS (Former Director of Human Resources);
- TOM SHALLCROSS (Former Manager of All CENTRO Supervisors);
- MIKE JABLINSKI (Former Employee Relations Manager);
- CARL BAKER (Former Employee Relations Manager)

- SCOTT  VANDERPOOL (former Managerial Supervisor)
- WAVERY FAISON (Security, and former Employee Relations Manager and Trainer);
- ELLIE RUSTON (Former Outside Supervisor)
- SHAWN  McMANUS, Bus Operator (Former outside supervisor);
- ROBERT C. SPRAGUE, Jr. (Former Chief Administrative Officer);
- KATHY FULLER, (Supervisor of **R**egional **T**ransportation **C**enter (RTC)
- WARREN WOODRUFF (Manager of RTC);
- ANGELIC MASON (Former Supervisor), and
- DAVE KRIESAL (Former supervisor);
- LON LARGE (Dispatch supervisor).
- ED MUELLAR (the former Union Vice President that filed false, fraudulent, and misleading charges against Plaintiffs', et. al., and, thus, was rewarded by CENTRO with a Managerial position in Service Development);

-and against-

**CENTRO'S LAW FIRM:** FERRARA, FIORENZA, LARRISON, BARRETT & REITZ, P.C., VIA ATTORNEY(S), FRANK MILLER; CRAIG M. ATLAS; AND/OR MILES LAWLOR, ET. AL.

-and against-

**AMALGAMATED TRANSIT UNION** (Local 580 and/or International) A-F-L, C-I-O): WARREN GEORGE (International Union President); JOSEPH WELCH (International V.P.); CHUCK WATSON (Business Agent, Secretary Treasurer); JOHN CAMPBELL (former Union President); DORTHY HUNTER(former Union V.P., and President); MARY NEGUENT (former Union Secretary); AL PARKER (former Union V.P); BILL MONTROY (Union Representative for Bus Mechanics); HOMER DAVIS (former trial committee investigator); BONNIE KRELL (Union member); BOB FAIRCHILD (Union member); MIKE CONWAY (Union member); MARY JANE TORTORICI (former Union Board member); PERRY TARQUINO (retired union member); ELLIOT ROUSE (retired Union member); CARLTON DERBY (Union member); TYRONE BURKE (former Centro Supervisor, now Union President); SCOTT  HAMILTON (Union Board member); KENNETH ORR (former union trial committee); DANA McMAHON (Union trial committee); BILL MINER (Union trial committee); JEFF KELLER (Union trial committee); FRANK CHAPMAN (V.P.); JOHN ZIEMBA (former Union board member) and,

-and against-

- **STEPHANIE A. MINER,** OF THE LAW FIRM OF **BLITMAN & KING** (UNION LOCAL 580'S LAWYERS)

-and against-

**N. Y. STATE WORKERS COMPENSATION BOARD ("WCB") MEMBERS AND EMPLOYEES: BOARD MEMBERS:**

- KARL A. HENRY;
- SCOTT C. FIRESTONE;
- CAROL G. McMANUS;
- JUDGE, MR. BOHER; WCB
- VANESSA E. JACKSON; COURT STENOGRAPHER,
- MICHELE ZAJAC; WCB ADMINISTRATOR
- MICHAEL J. O'BRIEN ; WCB ATTORNEY,

-and against-

**ATTORNEYS WOODS AND RICHMOND** (CENTRO'S "WCB" LAWYERS)

-and against-

**"PERMA"** CENTRO'S ("WCB") INSURANCE CARRIER (A/K/A PUBLIC EMPLOYERS RISK MANAGEMENT, UNDER THE LEADERSHIP OF C.E.O, "JOHN DOE" AND/OR "JANE DOE", AND THEIR AGENTS: JANE MOKAY, ET. AL.

-and against-

**"RMSCO"** CENTRO'S ("DISABILITY-NO-FAULT") INSURANCE CARRIER, ALL, UNDER THE LEADERSHIP OF C.E.O., "JOHN DOE" AND/OR "JANE DOE" AND THEIR AGENTS "JANE MILES" ET. AL.

-and against-

**N. Y. STATE UNEMPLOYMENT INSURANCE BOARD,** UNDER THE LEADERSHIP OF "JOHN DOE" and/or "JANE DOE" CHAIRPERSON AND THEIR INTAKE SPECIALIST "JOHN DOE," AND/OR CASE MANAGER SPECIALIST, Mr. DON LIVINGSTON.

-and against-

**ZURICH AMERICAN INSURANCE COMPANY,** UNDER THE LEADERSHIP OF "JOHN DOE" and/or "JANE DOE" C.E.O., AND/OR THEIR CLAIMS EXAMINER: ADOLFO S. HERNANDEZ.

- **STATE OF NEW YORK UNIFIED COURT SYSTEM, ONONDAGA SUPREME AND COUNTY COURTS: DEFENDANTS:** MARY THOMASON; DEBORAH STOLTZ: MARY LOU CROWLEY; HONORABLE JUSTICE, WILLIAM R. ROY,

- **MATTHEW E. BERGERON** (ATTORNEY) SATTER & ANDREWS LLP.

INTRODUCTION, JURISDICTION, AND VENUE

By this federal civil rights complaint, Yusuf J. Nuraldin, ("Plaintiff"), seeks to prosecute each and every named Defendant, all, so as to vindicate, once and for all, each and every guaranteed fundamental state and federal constitutional right denied to him, as an employee, by the Defendants. Plaintiff's decision to file this civil action, at this time, came about only after he was unable (for years) to appreciate that he was being intentionally discriminated against by Defendants *until* he had lived through a series of incidents (i.e., both, pre-termination and post-termination) and was then able to perceive the overall discriminatory pattern. For example: Within the last 30 months, Plaintiff was told, by a white employee, with personal knowledge, that the Union would *not* have Ok'd Plaintiff's unlawful discharge, on October 18, 2001, had he been a white male, on probation, and on at least 3-4 last chance letters; or, been the "white male" then previously fired, and later reinstated, by CENTRO, via the Union's use of thirty (30) thousand dollars, at arbitration, defending the charge that a white male CENTRO bus operator had use the word "NIGGER" to a student. Based upon the these recently disclosed incontrovertible facts, the federal courts should find that all of the Defendants' decade long recklessness, or callous disregard of Plaintiff's state and federal constitutional rights, that said lawlessness cannot today be tolerated in an ordered society and, thus, that the Defendants' unprovoked, pervasive, longstanding and widespread prejudice also will not continue based upon unlawful excuses, and/or inability, of the Defendants [due to political pressure or "buddyism"] to dispense racial justice and equality in a fair and impartial manner. Finally, Plaintiff (Yusuf J. Nuraldin) prays that the federal courts, after this filing, order that each and every Defendant herein cease and desist from engaging in any further and/or future acts of unlawful discriminatory employment practices, if not, then we might as well turn back the clocks to **150 years ago** and live our lives under the **Dred Scott Decision Case, of 1857**, where the key question then before the Justices of the U.S. Supreme Court was: "Whether in the eyes of the men who wrote the Constitution and the words, **"We The People,"** were these words intended to include the **African race** (Plaintiff)? The answer, by former U.S. Chief Justice, Mr. Taney, was as follows:

> "We think they are not, and that they are not included and were not intended to be included. They had for more than a century before been regarded as beings of an inferior order, and altogether unfit to associate with the white race, either in social or political relation; and so far inferior that they had no rights which the white man was bound to respect and that the negro might justly and lawfully be reduced to slavery for his benefit . . . This opinion was at that time fixed and universal in the civilized portion of the white race. It was regarded as an axiom in morals as well as in politics, which no one thought of disputing, or supposed to be open to dispute; and men in every grade and position in society daily and habitually acted upon it in their private pursuits, as well as in matters of public concern, without doubting for a moment the correctness of this opinion (see, S. Ct. 19 How. 393-633).

4

The final conclusion then reached by the U.S. Supreme Court, in 1857, was that African Americans were *not* citizens of the United States and thus they had rights which the white man was bound to respect.

## FEDERAL COURT'S JURISDICTION AND VENUE

Federal Court Jurisdiction is conferred upon this Court by 28 U.S.C. § § § § 1331; 1332(a) and (1); 1337 (Commerce Clause) 1367(a); Section 1391(b) and, also see, This Court's federal Jurisdiction is further invoked pursuant to subject matter jurisdiction over Plaintiff's claimed violations of his rights, privileges and immunities under federal law to, "have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other".

The Court's jurisdiction is also being invoked, under our U.S. Constitution and laws, due to Plaintiff being a member of a racial minority (as a Dark-skinned, African American) and a born and proud citizen of these United States of America and, by virtue of said status, entitlement to all rights, privileges and immunities, all, are now being called upon pursuant to the Federal Constitution, under Article I, § 8, cl.3, ["to regulate commerce * * * among the several states"; Article I § 10 [Law impairing the Obligation of Contracts and, the "ex post facto Law" where applicable herein] and, Title II, of the 1964 Civil Rights Act, and finally, the Constitution's Amendments 1st, 4th, 5th, 8th, 9th, 13th ("Black Codes") [1] & 14th ;  and, not excluding, Plaintiff's fundamentally guaranteed federal Constitutional Rights and Laws and/or civil rights, where applicable, herein under 42 U.S.C. § 1981; 1983, 1985(2)(3) and 1986; and § 1988; also, as to Union Defendants, the Court's Jurisdiction is being invoked under, Title I of the Labor Management Reporting and Disclosure Act ("LMRDA") (subchapter II of the Act, is entitled "Bill of Rights of Members of Labor Organizations," 29 U.S.C. § § 411-415. Americans With Disabilities Act ("ADA") 42 U.S.C. § 12101, seq.

---

[1] Black's Law Dictionary (7th Edition), p. 163, defines "black codes" as follows: **1.** Antebellum state laws enacted to regulate the institution of slavery. **2.** Laws enacted shortly after the Civil War in the ex-Confederate states to restrict the liberties of the newly freed slaves to ensure a supply of inexpensive agricultural labor and to maintain white supremacy. "Clearly, leaders of the old South who survived the war were in no mood for racial equality. It was a bitter enough pill that the slaves were legally free; there was no inclination to go beyond the formal status. The Black Codes of 1865, passed in almost all the states of the old Confederacy, were meant to replace slavery with some kind of caste system and to preserve as much as possible of the prewar way of life." Lawrence M. Friedman. A History of American Law, 504 (2d ed. 185)

Finally, and due to Defendants massive frauds which involve a voluminous amount of unconstitutional (and where the Court finds R.I.C.O-like acts) acts that, due to Defendants on-going unlawful discriminatory employment practices were a regular means by which the Defendants conduct their ongoing legitimate business and, by its nature, said unlawful acts and/or crimes projects into the future with a threat of repetition. This Court's Federal Jurisdiction is also being invoked, so as to toll the statute of limitations period, prior to October 18, 2001, under the doctrine of "fraudulent concealment" due to the fact that the doctrine of "fraudulent concealment" was designed to prevent a party, as in this case, from concealing a fraud, or committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations.

## THE COURT'S PENDENT JURISDICTION

The Federal Court's pendent jurisdiction is being invoked since many of the Defendants illegal acts, and/or unlawful conduct, all, complained heretofore, herein, and hereafter, by Plaintiff, all, contravene the laws and Constitution of the State of New York; specifically, Art. I, § 6 [due process]; Art. 1, § 8 [Freedom of speech and press] Art. 1 § 9 [Right to assemble and petition]; Art I, § 11 [Equal protection of laws, discrimination in civil rights prohibited]; Art. I, § 12 [Security against unreasonable searches, seizures and interceptions]; Art. I, § 17 [right to organize and bargain collectively], New York State's Civil Rights Law, § 40-c(1) and (2); Article 6, § 60 (individual's right to change of name); cf. § 19-A of N.Y. State's Vehicle and Traffic Laws (VTL); New York Penal Law, § 195.05, Obstructing governmental administration in the second degree (class A misdemeanor); also see, New York Penal Law, § 195.00, (1)(2) Official misconduct (by a public servant, is class A misdemeanor)[2] and, also see, P.L. § 215.15(1)(2)  Intimidating a victim or witness in the third degree (is a class E felony); P.L. § 175

---

[2] "Public servant" under Official Misconduct, is defined "broadly enough to include not only every category of government or public 'officer,' but every 'employee' of every such officer or agency, every person specially retained to perform some government service and every person who, though not having yet assumed his official duties, 'has been elected or designated to become a public servant' [P.L. § 10.00(15)]. Denzer and McQuillan, Practice Commentary to § 10.00, Mckinney's Penal Law (1967). See, e.g., Matter of Onondaga County District Attorney's Office, 1983, 92 A.D.2d 32, 459 N.Y.S.2d 507; People v. Kruger, 1982, 87 A.D.2d 473, 452 N.Y.S.2d 78.

"Benefit" under Official misconduct is also defined broadly to include any gain or advantage to the beneficiary as well as any gain or advantage to a third person pursuant to the desire or consent of the beneficiary [§ 10.00(17)].

## DEFENDANTS

**The Central New York Regional Transportation Authority** ("CENTRO") is a public authority and a public benefit corporation, pursuant to Public Authorities Law § 1328(1). CENTRO is organized under Article 5, Title 11-D of the Public Authorities Law. In addition to the general authority granted to public employers under Taylor Law (Article 14 of the Civil Service Law), CENTRO is authorized by its enabling legislation "to enter into collective bargaining agreement ("CBA") with labor representatives" (see, Public Authorities Law, § 1331(A)(14), 1332(5). Its subsidiaries include, CNY Centro, Inc., Centro of Oswego, Inc., Centro of Cayuga, Inc., and Centro of Utica, Inc (collectively referred to as "CENTRO"), all, are public benefit subsidiary corporations of CENTRO which directly employs mechanics and bus operators.

Under the terms of the CBA between CENTRO and the Amalgamated Transit Union, Local 580, Syracuse N.Y., (CBA of which Plaintiff was unlawfully terminated) Defendants Kobliski, Renock, Share, Degray and Lee, et. al., (all, acting under color of state law and/or in their capacity as public servants,), all, then were parties to said CBA with a term from November 1, 1999 through October 31, 2002. Thus, pursuant to § 209-a.1(e) of the Civil Service Law (the "Tri-borough Amendment" to the Taylor Law), the terms of the 1999-2002 CBA continued in effect then beyond its expiration date, until the parties reached agreement on a new contract. Therefore, said CBA, supra, as well as all CBAs in effect prior thereto, all, was in effect at all times relevant to this Civil Rights Action; thus, each Defendant, supra, due to their fiduciary relationship to Plaintiff and due to Plaintiff's reposed confidence in Defendants due to Defendants superior expertise or knowledge, all, was responsible for the overall control, supervision, management, and/or enforcement of each and every CBA's terms and conditions of Plaintiff's pre and/or post-employment under the CBA's rules and/or regulations, pursuant to its Conformity to Law and/or Non-Discrimination Clauses, etc, etc.

Finally, and based upon the above, each Defendant, supra, then was also responsible for ensuring that Plaintiff's rights, privileges, terms, and/or conditions of his employment were administered to him in a constitutionally fair, impartial, non-discriminatory, non-fraudulent, manner as mandated in said CBA and, not excluding, Defendants compliance with, and/or enforcement of, Plaintiff's rights, privileges, and/or immunities under U.S. Const. Amend. First (freedom of speech, association, right to petition government for redress of his grievances, assembly) Fifth (due process); Eighth (cruel and unusual punishment); Ninth; Thirteen (Black Codes) and Fourteenth and, not excluding, Plaintiff's right not to be discriminated against based upon his race, color, sex, religion (name), gender, disability, fraud, fraudulent concealments, access to the courts, conspiracy, R.I.C.O., and/or Plaintiff's right to privacy.

7

**Defendant CENTRO's Board of Directors ("BOD"),** we repeat and realleges the above facts and laws, where applicable; thus, the BOD, under same CBA, supra, and under all other CBA's ratified prior thereto, all, had same duty and responsibility to comply with and/or obey all state and federal laws and/or monitor, control, supervise, manage, correct, discipline, and/or terminate, any and/or all CENTRO Defendants that they knew and/or should have known that were engaged in unlawful, and/or egregious, discriminatory and/or fraudulent employment practices against the Plaintiff and "others;" thus, said BOD too was responsible for the overall control, supervision, management of CENTRO's Executive, Managerial, and/or Supervisory personnel and, thus, they, especially, had a duty and an obligation to Plaintiff, and specifically to the public, so as to avoid, as here, a repeat performance of yesteryears Newsworthy Federal Civil Rights case, involving former CENTRO Supervisor Gary Morris, before a federal jury, where Mr. Morris detailed to a federal jury how same Defendants, supra, year after year had engaged in the almost identical type of racially motivated unlawful discriminatory employment practices as complained of herein by the Plaintiff and, that same Defendants, too, had engaged in similar frauds which were frowned, upon after the trial, and editorialized by the Syracuse-Herald Journal Newspapers wherein the author then stated, in words and/or in essence, that if CENTRO had a anti-discrimination policy then they should have used it for the benefit Central New York's tax-paying citizens. [3]

---

[3]  Corporate law generally gives broad power to the board of directors of a corporation to name and appoint the corporation's officers, in accordance with the corporation's bylaws. The officers may be empowered, again in accordance with the bylaws, to appoint other officers, and one person may hold multiple officers. The legal approach here is to give the board of directors considerable discretion on appointing agents who will manage and operate the firm. With the possible exception of the secretary, the typical officers are those with, whereas here, a policy-making or specific operating responsibility in the corporation: the CEO, the CFO, the general counsel, the president, treasurer and vice-president in charge of a division. As part of its operational responsibility, that is, Directors and/or Officers' liability herein, senior management is charged with:

Operating the corporation.The CEO and senior management run the corporation's day-to-day business operations. With a thorough understanding of how the corporation operates and earns its income, they carry out the corporation's strategic objectives ( "unlawful discriminatory employment practices against Plaintiff) within the annual operating plans and budgets, which are review and approved by the board. In making decisions about the corporation's business operations, the CEO considers the long-term interest of the corporation and its shareholders and necessarily relies on the input and advice of others, including senior management and outside advisers. The CEO keeps the board apprised of significant development regarding the corporation's business operations.

Strategic planning. The CEO and senior management generally take the lead in strategic planning. They identify and develop strategic plans (both legal, or lawful, and/or illegal and/or unlawful) for the corporation; present those plans to the board; implement the plans once the board review is completed; and recommend and carry out changes to the plans as necessary. Under most by laws, senior executive officers, particularly the CEO or the President, have considerable authority and can bind the firm, except in the most extraordinary of events. The authority of other officers is similarly circumscribed as to their positions in the firm (citations omitted).

**New York State Workers Compensation Board ("WCB") Defendants,** Plaintiff repeats and realleges all the above facts and laws, where applicable, including, but not limited to, Defendants CENTRO and Union's "CBA. " Defendants WCB, all, are employees of the State and, as a matters of state law, they too had/have a duty, responsibility, and/or obligation, "in good faith" to assure that each and every employee named herein at the WCB, located at 935 James Street, Syracuse, N.Y., complies with and/or obeys all the laws, statutes, provisions and/or rules of our New York State and Federal Constitutions, as applicable to all unlawful discriminatory practices (see, WCL § 120, discrimination) and, Specifically, Plaintiff's rights, privileges, and/or immunities under U.S. Const. Amend. First (freedom of speech, association, right to petition government for redress of his grievances, assembly) Fifth (due process); Eighth (cruel and unusual punishment); Ninth; and Thirteen (Black Codes) and Fourteenth and, not excluding, Plaintiff's right not to be discriminated against based upon his race, color, sex, religion gender, disability, fraud, fraudulent concealments, access to the courts conspiracy, R.I.C.O., and/or Plaintiff's right to privacy.

**PERMA: ("PUBLIC EMPLOYERS RISK MANAGEMENT")** Plaintiff repeats and realleges, where applicable, all the above facts and laws, including, but not limited to, Defendants CENTRO and Union "CBA," plus, PERMA is a corporation organized and existing pursuant to the laws of the state of New York, with its principal place of business believed to be located in New York's State's Capitol, Albany New York and, as such, PERMA's employees, by law, have the same duties, responsibilities and/or obligations to follow and/or enforce state and federal laws as the WCB, supra.

**RMSCO: CENTRO'S DISABILITY-NO-FAULT INSURANCE CARRIER:** As to each and every named Defendant, supra, Plaintiff repeats and realleges herein the above facts and laws, where applicable, including, but not limited to, Defendants CENTRO's and Union's "CBA", except that RMSCO's principal place of business is believed to be located in Syracuse, New York.

**ZURICH AMERICAN INSURANCE COMPANY: CENTRO'S DISABILITY INSURANCE CARRIER:** As to each and every named Defendant, supra, Plaintiff repeats and realleges the above facts and laws, where applicable, and Defendants' CENTRO and Union "CBA," except that ZURICH AMERICAN INSURANCE COMPANY's principal place of business is believed to be located

**STATE OF NEW YORK UNIFIED COURT SYSTEM: ONONDAGA SUPREME & COUNTY COURTS:** As to each and every named Defendant, supra, Plaintiff repeats and realleges all the above facts and laws, including, but not limited to, Defendants CENTRO's and Union's "CBA" and, the term "fiduciary duty" and/or obligation" where applicable.

9

**AMALGAMATED TRANSIT UNION LOCAL 580/INTERNATIONAL UNION:** As to each and every named Defendant, <u>supra</u>, Plaintiff repeats and realleges all the above facts and laws as applicable.

**DEFENDANT(S): ALL UNION ATTORNEYS AND/OR LAWYERS NAMED HEREIN**

As to each and every named Union Attorney and/or their respective laws firms, Plaintiff repeats and realleges the above fact and laws, including the term "fiduciary duty" and/or obligation, where applicable. Additionally, Defendants, as officers of the court, and sworn to uphold the constitutional laws of both the New York State and Federal Constitutions, all, knew and/or should have known of that their violation of <u>Rule, 11,</u> of the Federal Rules of Civil Procedure (FRCP) and/or same violation under state **xxxxxxxxx** that said violations **contravened** his, or her, Code of Ethics under the Professional Responsibility Standards, Rules & Statutes, in that, each lawyer knew and/or should have known the following: that as an officer of the legal system and public citizen they have special responsibility for the quality of justice; and that each of them, now, under <u>RULE</u> 3.3 <u>Candor Toward the Tribunal</u>, acting, either, individually and/or collectively (excluding the state courts below) shall not now knowingly (in the federal courts) commit the following:

      (1) make a false statement of material fact or law to a tribunal;

      (2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;

      (3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or

      (4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.

      (b) The duties stated in paragraph (a) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by rule 1.6.,

      (c) A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.

      (d) In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse (<u>also see, RULE</u> 3.4 (a) <u>Fairness to Opposing Party</u> . . .; <u>RULE</u> 4.1(a)(b) <u>Truthfulness in Statement to Others</u>; <u>RULE</u> 5.1(a)(b) (c)(1)(2), <u>Responsibilities of a Partner or Supervisory Lawyer</u>; RULE 5.2(a)(b) <u>Responsibilities of a Subordinate Lawyer</u>; <u>RULE</u> 8.4, <u>et</u>. <u>seq</u>., <u>Misconduct</u>.

## COLLECTIVE BARGAINING AGREEMENT ("CBA") between CENTRO & UNION,

Conformity to Law: This agreement and its component provisions are subordinate to any present or future Federal or New York laws and regulations. If any Federal or New York law or regulation, or final decisions of any Federal or New York court of administrative agency, affects any provision of this Agreement, each such provision will be deemed amended to the extent necessary to comply with such law, regulation or decision, but otherwise this Agreement will not be affected.

NON-DISCRIMINATION: Both parties agree not to discriminate against any employees or applicant for employment because of race, creed, sex, color or national origin, and will take affirmative action to insure that they are afforded equal employment opportunities without discrimination because of race, creed, sex, color, or national origin. Such action shall be taken with reference to, but not limited to: recruitment, employment, job assignment, promotion, upgrading, demotion, transfer, layoff, or termination, rates of pay or other forms of compensation and selection of training or retraining including apprenticeship an on-the-job training.[4]

---

[4] Noteworthy, on or about June 29, 2007, approximately 200-400 Union members ratified a proposed contractual agreement with Defendant CENTRO and, in said ratified proposal, both, the Union and CENTRO agreed for the first time in CBA history that "sexual preference" would be included in the then "new" contract, thus providing legal/job protection to individuals such as PEGGY THOMAS, an admittedly GAY female who was unlawfully discharged by CENTRO, under the above CBA ratification-agreement. Recently, however, it was discovered that because Plaintiff was representing Ms Thomas in her Unemployment Insurance case (and a case likely to be reversed on appeal and, thus thereafter a civil action will be filed in the federal court) the Union and CENTRO secretly, via fraud and/or fraudulent concealment, and without knowledge, or consent from the 200-400 membership, arbitrarily "deleted" said "sexual preference" language out of the "new" CBA's Conformity to Law Clause/Non-Discrimination Clauses, all, so as to prevent this Plaintiff from alleging and thus proving, via Ms PEGGY THOMAS, that the Union and CENTRO, historically, never accepts, nor investigates any grievances filed by African Americans, complaining of discrimination, unless whereas in Ms. Peggy Thomas case ("after" her termination) her written grievance was accompanied with a unsigned cover-letter informing CENTRO and UNION that she (and both Centro/Union had already known that she) was GAY, Plus "black", Plus "disabled." Simply Put, for over 17 years, or more, Plaintiff never knew that he being "straight" Plus "Black" complaining of discrimination, that his "straight" blackness in/of itself, at CENTRO DID NOT COUNT. Simply put, Plaintiff just discovered that you must be "GAY" *Plus* "Black" or vice versa, to be heard.

Plaintiff's purpose and/or reason for, initially, alerting the Court to the above issue of his client's Ms. Peggy Thomas "sexual preference," under our state and/or federal constitutions, all, is to save time by cutting to the chase (on the issues of fraud/fraudulent concealment/breach of contract, thus, tolling Plaintiff's 42 U.C.C.§ § § 1983, 1985(2)(3) and 1986, complaints. Recently, on or about July 23, 2007, Plaintiff then received (for the first time), in writing, that both Defendants CENTRO and the Union takes serious and/or investigates ONLY those employee grievances (i.e., post-terminated, non-employee, grievances), challenging unlawful discriminatory employment practices, that are filed by black employees (like Ms Peggy Thomas) who are "gay," and "black"; that both Defendants (over 17 years) either ignored and/or dismissed, out right, any and all of Plaintiff's grievances that spoke on matters of public policy simply because he was "straight" and "black." In fact, recently, on July 23, 2007, July 25, 2007, and on August 1, 2007, former CENTRO Bus Operator Ms. Peggy (Nikea)Thomas ("after" her termination) received in the mails three (3) separate letters from Defendants CENTRO and the Union, all, in reply to this Plaintiff having filed a post-termination grievance, on Ms. Thomas's behalf, together with a one (1) page complaint threatening a Civil Action under Title VII, of the 1964 Civil Rights Act. Both Defendants in their reply letters then wrote and told Ms. Thomas that they would

**ARTICLE III**

**CHARGE**

§ 3.01 **Definition of a Charge**

For the purpose of this agreement, a charge shall be defined as a statement of alleged rule violation, preventable accident or other act of misconduct put forth by the Employer against an employee or employees. Such an allegation could result in a disciplinary action, including but not limited to: instruction, warning, suspension, time served at the bottom of the list, probation, **discharge** and/or other monetary penalty.

§ 3.02   (a) All charges must be filed within (15) business days from the date the Employer became aware of the cause that precipitated that charge(s). In cases where the Company can substantiate the need for additional time to investigate a particular charge, the Employer may file said charge within thirty (30) business days. Business days shall mean Monday through Friday except legal holidays. Substantiation for anything beyond 15 business days shall be provided to the Union in writing within two (2) business days of the charge having been made

(b) A charge shall be considered filed when notice is given by the Employer in any one of the following ways:

(1) An employee receives verbal or written notice to see the official in charge regarding a charge. Verbal notices shall be followed up by written notices within 5 business days.

(2) The Union receives verbal or written notice that an employee is to see the official in charge regarding a charge. Verbal notice shall be followed up by written notice on the next business day.

(c) Any charge which is not filed in accordance with the time periods in (a) above will be

---

"investigate" and/or "evaluate" any and all allegations mentioned in her post-termination grievance, of "not (being) afforded the opportunity (multiple chances) given to white employees who have committed far worse acts than yourself," "disparate treatment," and, to complete their investigation Defendants then asked Ms. Thomas to submit "any evidence", whatsoever, supporting "the acts that they (whites) committed" and, to "Please include all pertinent information including dates, times and witnesses if applicable" (see, copy of Defendants' three (3) letters and, Ms. Thomas's employee grievance (that was prepared by this writer), all, attached hereto, under PEGGY THOMAS (Noteworthy, however, is that Ms. Peggy Thomas, is the first gay member of Central New York's ZEBRA TEAM)

Base upon the above, Plaintiff hereby contends that, until said discovery, supra, both Defendants, made it such and/or concealed from the Plaintiff that "straight" black employees, such as he, would be kept unaware that a cause of action existed on their pre-termination/post-termination grievances concerning issues involving unconstitutional employment practices inviolation of the CBA, and/or inviolation, whereas here, Plaintiff's first fifth, ninth thirteenth and fourteenth amendments rights, that said grievance would not be investigated unless he was gay, plus black. Therefore, defendants actively and/or effectively, concealed from Plaintiff that being "black" in/of itself was/is insufficient with Defendants to go out and investigate complaints of race-based discrimination (see, Long v. Frank, 22 F.3d 54, 58 (2d. Cir.1994), cert. denied, 5213 U.S. 1128, 115 S.Ct. 938, 130 L.Ed. 2d 883 (1995), also see, New York v. Hendrickson Brothers, Inc., 840 F.2d 1065, 1083 (2d. Cir.), cert. denied, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988).

waived by the Employer and may not thereafter be subject to disciplinary action. It is understood that any time limits may be waived by mutual agreement.

(d) In cases where an employee is summoned to answer a charge, a copy denoting the nature of the charge shall be forwarded to the union. Said copy shall be forwarded to the union prior to any meeting regarding alleged charge(s) that may involve time off or removal from service

### 3.05  HEARINGS BETWEEN EMPLOYEE/EMPLOYER/UNION

(a) Prior to a hearing with the Employer, the employee will be made aware of the date and the nature of the alleged violation. Prior to any meeting regarding alleged charge(s) that may involve time off or removal from service, a copy of said charge(s) shall be forwarded to the Union

    (1) The employee will then be advised of his or her rights to Union representation and asked if he or she requests that a Union official be present. The Company document relative to such hearing will reflect this fact (i.e., Centro's PERSONNEL REPORT)

    (2) At the conclusion of any hearing in which disciplinary action is imposed, the employee will sign that part of the Personnel Report which indicates whether a Union official was present, and will sign the appropriate line indicating receipt of a copy of the report.

(b) An employee may, after hearing the charge, request an adjournment of two (2) business days for the purpose of obtaining Union representation. This period may be extended by mutual agreement between the Employer and the Union.

(c) At least twenty-four (24) hours prior to any hearings between the Employer and the employee, the outcome of which may result in termination, "the Union" ("Emphasis ours") will be given a copy of all pertinent evidence that the Employer intends to use at the hearing. Upon review of said evidence, the Union may request postponement of the hearing to prepare a defense, provided such interval is of reasonable length".

Plaintiff hereby repeats and re-alleges all the foregoing and additionally claims:

The Plaintiff began his employment with Defendant CENTRO in February 1992, as a part-time bus operator and he continued in said involuntary capacity until, on Wednesday October 10, 2001, his then immediate supervisor, Defendant Duke Bailey, unlawfully, and then unprovoked, used excessive force, on Plaintiff (at CENTRO's Headquarters) by physically beating Plaintiff to the floor, all, in front of a fairly large group of bus operator eye-witnesses, all, because Plaintiff then, after picking up N.Y. State disability forms, chose to engaged in a peaceful and friendly conversation with other fellow bus operators.

That the Defendants, each acting, either, individually and/or collectively, with others, and/or acting or pretending to act under color of state law in their official and/or unofficial capacity, and/or acting personally and/or under the direction of his/her superior(s), all, via an official long-term policy and/or custom, and all conscious of or trying to influence the law, or endeavoring to obstruct or interfere with it, they all, with intent that conduct constituting a violation of state and federal law be performed, said Defendants herein, in carrying out the above unlawful acts against Plaintiff, all, did knowingly, intelligently, intentionally, deliberately, purposefully, maliciously, willfully, voluntarily, and in "bad faith" agreed with each other and with others to falsely, fraudulently, and/or misleadingly, attach a "Badge of infamy" upon Plaintiff by unlawfully classifying him then as career long "non-promoteable," thereby, subjecting him (without due process) to a code not applicable to any other employee.

That the Defendants intent and/or purpose, at all times, during his entire tenure with Defendant CENTRO, was to attach a badge of infamy to Plaintiff and, then, thereby, subject Plaintiff to the infamous "Black Codes" long ago outlawed by our country's Reconstruction under the Thirteenth, Fourteenth, and/or Fifteenth amendments). That,  said "code" (from December 1991, until October 18, 2001, on-going, caused Plaintiff to (and Plaintiff did) work, and/or stand (before all Defendants named heretofore and/or herein) unequal before the laws of both our state and federal laws and/or constitutions and same false and fraudulent badge of infamy and/or black codes, also, caused Plaintiff to (and Plaintiff did) work, and/or stand, unequal before the Defendants, and/or his former co-workers, under both Defendants (i.e., CENTRO's and the Union's) Collective Bargaining Agreement ("CBA").

14

That the Defendants "code" and/or "badge of infamy" caused Plaintiff to be unlawfully denied the opportunity, the right, and/or privilege (as was afforded to other bus operators, both black and white) to train, with pay, as a full-time bus operator and/or, alternatively, effectively denied him the opportunity to drive as a Part-time bus operator, 35-80 hours per week, as was allowed for "other" bus operators (both black and white, male and female), in excess of, and/or in gross violation of, the CBA's mandatory limit of twenty five (25) hours for Part-time operators (see, CBA, attached hereto, at Art. XXV, § 25.01(9), page 72)

That the Plaintiff, all through his almost ten (10) years of employment, with Defendant CENTRO, as a part-time bus operators, with no benefits, continued to repose confidence in both herein Defendants (i.e, CENTRO and his Union) even after he was unlawfully and fraudulently terminated, and (rightly or wrongly) Plaintiff also reasonably relied on, to his detriment, Defendant's superior expertise, and/or superior knowledge, together with Defendants (1991) then expressed and/or implied promise in Defendants advertisements to the public that part-time bus operators will be afforded the opportunity to go full-time, within one (1) year, or so, upon the operator's completion of probation.

That the Plaintiff also, reposed confidence in Defendant CENTRO and the Union and reasonably relied on, to his detriment, Defendants expressed and/or implied promise and/or superior expertise or knowledge that promotion to full-time bus operator would be, solely, based upon the Defendants and the Union's policy procedures and/or CBA agreement's that any and all Part-timers, prior to being considered and, thereafter, appointed to full-time bus operator positions that said Part-timers, first, must become familiar with any and all required and/or mandatory full-time bus routes by riding said routes with full-time bus operators.

Second, and that any and/or all appointments to full-time bus operator positions, all, shall be based upon CENTRO's and the Union's regular yearly employee-evaluations, coupled with each full-time applicant being evaluated under its Thirteen (13) point full-time required qualification system for advancement from "part-time" bus operator to full-time bus operator.

That Plaintiff, during the years 2005-2007, on-going, first, discovered that Defendants had then previously arbitrarily abandoned the aforementioned system for promotion to full-time bus operator and, that a new arbitrary system centered upon a non-contractual full-time promotion policy and/or procedure whereby newly hired bus operators are able to move into full-time bus operator positions almost immediately upon their graduation from their thirty (30) day classroom and road training, as opposed to Plaintiff's 1991-1992 thirteen (13) week period classroom and over-the-road training period.

15

That the Defendants Frank Kobliski, et. al., and Union Business Agent, Chuck Watson, individually and/or collectively, or acting together in improper combination, under color of state law, agreed to (and did) deny and/or stultify Plaintiff's access to the courts and/or access to administrative proceedings, all, so as to prevent, as here, in the federal courts, Plaintiff from ever exposing to the public Defendants fraud, fraud on he courts, fraudulent concealments and/or their constitutionally impermissible unlawful discriminatory employment practices.

That each State and County Defendants' decision to participate in this massive fraud, against Plaintiff, all, was to insure that each and every Defendants participation in this private conspiracy would be maintained (and in fact was maintained) in order that said constitutionally impermissible conduct could operate more effectively. The success of each Defendants fraud and/or conspiracy and overt acts in furtherance of this conspiracy, all, depended on Defendants individual and/or collective malice against Plaintiff. Defendants entire fraudulent conduct, all, was predicated on an invidious discriminatory animus, class based, against Plaintiff because of his ability, courage, and/or willingness to exercise his first amendment constitutional right to speak "truth to power," on matters of public concern.

That each and every Defendant herein knew and/or should have known of the frauds, frauds on the courts, fraudulent concealments and/or, where applicable, wrongs then conspired to be done, against Plaintiff, and having prior knowledge of how said unlawful acts, frauds, and/or crimes would be committed, and having the power to prevent and/or aid in its prevention of same, neglected and/or refused to aid in it prevention; and, that each and every Defendants' superiors herein, all, failed to properly train each employee, agent, and/or subordinate employee and/or agent of Defendants

That Defendants failure to act, supra, was the result of their own obstructionist tactics and, that each and every Defendant knew or reasonably should have known that the action he or she took within his or her sphere of official responsibility would violate the constitutional rights of Plaintiff and, that each and every Defendant herein took said action with the malicious intention to cause a deprivation of Plaintiff's constitutional rights and injury to his person; that the Defendants conduct independent of his or her lawfulness or unlawfulness at state law, is sufficiently egregious as to be constitutionally tortuous.

Finally, that each and every Defendants intentional frauds and/or, where applicable, conspiracy to commit fraud herein, all, involved a preconceived plan agreed upon by the Defendants, and their Defendant co-conspirators, to accomplish a common goal via each Defendants willful participation in joint activity through the use of their most powerful and influential employee(s) and/or board member(s) in Defendants

16

corporate and/or state administrative community and, that each and/or every Defendant personally, participated, authorized, directed advised, aided encouraged, ordered, sanctioned, condoned, approved and/or ratified, all unlawful conduct complained of herein by Plaintiff

## PLAINTIFF'S WORK HISTORY AT CENTRO

On or about December of 1991, Plaintiff was chosen for hire, by Defendant CENTRO, out of a pool of approximately two hundred (200) applicants that had applied for the position of part-time CENTRO Bus Operator. As a result, twelve (12) people, including Plaintiff, was selected for bus operator training. Several weeks after Plaintiff began his training as a part-time bus operator (i.e., December 20-24, 1991) he was summoned by Defendant Waverly Faison (CENTRO's then elite bus operator trainer) to meet with Defendant Craig Williams (CENTRO's then Director of Human Resources).

At the above meeting Defendant Williams told Plaintiff, in the presence of Defendant Faison, that upon Plaintiff's then future receipt of a Commercial Drivers License ("CDL"), Plaintiff would be transferred from CENTRO, to PEACE Inc., as a CALL-A-BUS Operator.

Plaintiff, upon hearing the above revelation, respectfully, then informed both Defendants, supra, that his application to the New York State Labor Department identified CENTRO, not Peace, as the employer he had chosen for 19-A training, and eventually employment, at CENTRO, operating large buses, not mini buses as are operated by PEACE Inc.,

Defendant Williams then told Plaintiff that he should seriously consider working for PEACE because Plaintiff's resume showed that he had a background working with the disabled and, thus, based upon Plaintiff's then refusal to transfer to a lesser paying job with PEACE Inc., CENTRO would, nor could, not guarantee that he will be offered an opportunity for promotion to full-time bus operator (in light of the fact that CENTRO's then previous advertisements, for part-time bus operators, said otherwise as to promotion to full-time bus operator positions).

Almost immediately after the above conversation, Plaintiff rode the bus with former CENTRO bus operator, Don Johnson, who, incidentally, was the individual who, first, had directed Plaintiff to apply to CENTRO as a part-time bus operator. Interestingly enough, during Plaintiff's ride home on the bus, and then unbeknownst to Plaintiff, a conversation came up about the aforementioned subject of Peace and,

whereupon, Don Johnson then replied, in words or in essence, "why would you want to work for Peace driving their buses, at a lower rate of pay, when you can work for CENTRO and still do Call-A-Bus, for Peace, at CENTRO's higher rate; whatever he's (Craig Williams) telling you, or trying to do, makes no sense, because you can always sign up to do Call-A-Bus, or regular line work like I doing now."

Thereafter, in February of 1992, and at the conclusion of CENTRO's then thirteen (13) weeks of training for his Commercial Drivers License ("CDL"), Plaintiff was awarded his § 19-A, Vehicle and Traffic Law (VTL) bus operator's license. However, prior to taking to the road, Allen Brownjohn, CENTRO's then elite classroom and road trainer, told all twelve (12) trainees then that each of them had to draw lots for CENTRO's seniority records and, that said in-house records would be used to determine each persons then future seniority classification with CENTRO. Ironically, Plaintiff then (by luck of the draw) selected the number one (1) straw which then pole vaulted him into the number one (1) seniority position in/of his class of 1992 (Note: Plaintiff's class then included the Defendant Joe Degray, V.P. of Operations).

During the years 1993-2001, the following acts occurred: The Plaintiff, after becoming # 1, in seniority in his class of 12 new bus operators and, while waiting to be selected for training as a full time operator, Defendants CENTRO and Union then, both, became aware that Plaintiff had helped a "part-time" bus operator, named Suffiddeen Ali, file an Equal Employment Opportunity Commission ("EEOC") complaint then challenging Defendants then highly unlawful discriminatory promotion practices of having then previously, over the years, had promoted individuals from part-time bus operator to full-time bus operator, not by his/her seniority date but, by the illegal and/or unlawful practice of "word of mouth" promotion (i.e., CENTRO and the Union would, secretly, ask and, thereby, promote individuals whom they thought should be full-time operators, regardless of the individual's hiring (starting) date.[5] Plaintiff's successful filing of said discrimination EEOC complaint ultimately forced both Defendants to do away with said unlawful practices and, thus, a full-time bus operator's sign-up list, based on seniority, was born. Plaintiff then, in relying on Defendants "good faith" in following the law, signed his named on the third (3rd) line (slot) from the top of the list, thus he then became the third person in line to be considered for training and promotion as a full time operator.

---

[5] Prior to Plaintiff's successful EEOC complaint, drafted and filed on behalf of then part-time bus operator Suffiddeen Ali, CENTRO and/or the Union was able to arbitrarily violate state and federal laws (which they still do, as evident in this case) by arbitrarily promoting select individuals. For Example, if a person was hired on January 1, 2000 (and Centro and/or the Union disliked that person, for any reason) the Union and Centro then, under their old policy, they would then unlawfully select, for promotional purposes, a person well liked by them that was hired, say, several years later on January 1, 2008, thereby passing over the person(s) disliked by them.

To no avail, however, late in 1993, after Plaintiff had just earlier reposed confidence in Defendants CENTRO and the Union and had reasonably relied on their superior expertise, or knowledge, several of Plaintiff's classmates, including Defendant V.P. Joe Degray (but, excluding Plaintiff, however) said classmates, all, were then given the opportunity to train, with pay, for full-time bus operator positions and, thus, all, subsequently thereafter were hired that year, or shortly thereafter, as full time bus operators.

Next, and, all, as a result of Plaintiff's filing of the EEOC complaint, supra, Defendant Tom Shallcross summoned Plaintiff into his dispatch area office whereat he then told Plaintiff, in words and/or in essence (and in secret), that Plaintiff, probably, may never get the opportunity to become a full time bus operator because Plaintiff's resume showed he had some legal training in the past and thus a real possibility then existed that CENTRO, and the Union, may never recommend promotion. Defendant Shallcross then confided in Plaintiff that he, too, wanted to study law but somehow due to his first wife, he never did.

On or about the above time frame, while Plaintiff was operating an in-bound bus route from an area called Nedrow to downtown Syracuse, N.Y., Plaintiff's bus radio shouted out that a small child had wandered away from her parents in the shopping area of Nedrow and, that the Police were asking for CENTRO's help in locating said child. Plaintiff then, armed with the child's height, race, and clothing description in mind, minutes later, notified Defendant Scott Vanderpool (CENTRO's then inside supervisor), that he had spotted the child wandering across the street holding her doll baby in her arms. Plaintiff then, via his bus customers consent, stayed with the child until the police with the parents arrived. As a result, however, Plaintiff thereafter, never received a thank you, a commendation and, no recognition was ever forthcoming from CENTRO (see, News paper article by former Bus operator, author, Dwight Williamson (and African American) wherein he had, single handedly, apprehended an individual who had just committed a felony and CENTRO, knowing of said fact, gave away his hard earned written commendation, and a wall plaque, to their favorite long-time "white" bus operator who, incidentally, was no where at the scene of the crime.

## FALSE ACCIDENT REPORTS AND FALSE HARASSMENT
## REPORTS BY WHITE (FEMALE) CO-WORKER OPERATORS

On or about same time, supra, a female bus operator name Bonnie Krell, per request of CENTRO Defendants Carl Baker, Ellie Ruston, and/or Leo Williams, filed a blatantly false, fraudulent and misleading complaint, falsely, charging Plaintiff with having caused her to be late getting downtown and, thereby, harassed her.

Defendants selectively chose Bonnie Krell's then bus route, together with Plaintiff's then bus route, because both routes, after leaving the Syracuse University campus, and after traveling through the downtown Syracuse area, said buses (then carrying all white passengers) proceeded out to the suburbs and, thus, Defendants then believed that any false complaints made by a white female bus operator, against Plaintiff, that said complaints would then be corroborated by the all white group of passengers and, thus, CENTO and the Union then would be able to terminate Plaintiff, via their then racially motivated tactics.

Both Defendants then racist plans failed, each and every passenger then on both buses (Bonnie Krells bus and Plaintiff's bus), all, in writing and/or by telephone interview corroborated Plaintiff's version of the facts, in that, Bonnie Krell was a perjurer and, that her complaints, all, were racially motivated.

Based upon Plaintiff's "own" investigation into the above matters, coupled with Defendant's being forced to conduct a subsequent investigation, Defendant Carl Baker then, ultimately, admitted (as Plaintiff had initially claimed) that he (Carl Baker), not Defendant Bonnie Krell, was the one who had written the racially motivated false, fraudulent, and highly misleading complaint letter that led to Plaintiff being falsely and maliciously charged, by CENTRO, and then, thereby, brought before CENTRO's pre-termination hearing on said false charges. Present at said pre-termination hearing was Defendants Craig Williams, Waverly Faison, Defendant John Recock, and Plaintiff.

Next, and still refusing to promote Plaintiff, on Monday June 21, 1993, after pulling his bus (# 720) out of CENTRO's bus garage, Plaintiff was flagged down by several pedestrians frantically shouting, ducking and fleeing, while pointing that his "Black-Metal-Air-Vent-Grating" located on the passengers side of the bus had, somehow, then managed to come loose and swing out and open. Plaintiff then immediately returned bus No. 720, back to CENTRO and, thereafter, filed a lengthy typed written report, with photo exhibits (which spoke at length on matters of public concern and/or public policy), all, written and filed with the Defendant's Supervisory Accident Investigation Team and, also, written and/or filed with then Chairman of the Board, Defendant Cook and then C.E.O., Defendant Warren Frank.

As a result, on June 25, 1993, just five (5) days after the above, Defendant, supra, then elected to falsely charge Plaintiff with having "caused" damage to the above-mentioned bus No. 720.

Plaintiff, again, upon conducting his own investigation on Bus No. 720, discovered that the alleged "new" damage, the above "Black-Metal-Air-Vent-Grating," that said "new" damage was, in fact, "old" damage that had prior to June 25, 1993, been on file with CENTRO, sixty five (65) days earlier, on April 7, 1993.

Further, Plaintiff then also discovered that not only had said damage been documented on April 7, 1993, but that the damage had gone un-repaired until the very day that Plaintiff had been assigned said Bus No. 720. In 65 day old damage, according to reports, was the result of an driver having an "House High" collision and/or scraping.

Another highly racially motivated incident occurred when Defendant Carl Baker summoned Plaintiff into his office to tell Plaintiff that a either Baldwinville CENTRO Supervisor, or an Oswego Supervisor, had contacted his office and complained that Plaintiff arrived in their area with a damaged bus. In reply, Plaintiff told Defendant that not only had he never driven a bus to either area but, that he had never visited said area and, that the complaining CENTRO Supervisor had identified the "wrong" black man.

Another similar, but more frightening race-based incident occurred when Defendant Patty Dishaw (Manager of Service Development) asked Security Chief Defendant Waverly Faison to personally escort Plaintiff to her office and, that Waverly Faison was to remain with Plaintiff, until she formally, falsely, fraudulently, and/or via sheer racial motivation, accused Plaintiff (and she did) of having caused a Clary middle school child to dragged, by the back door, along side of a CENTRO bus, thus causing said child to suffer serious injuries.

Defendant Patty Dishaw then, upon hearing Plaintiff adamantly deny her false allegations by saying, "Listen Miss, you got the wrong guy, again, I don't pick up Clary middle school kids and, my bus route does not take me into Clary Middle School property, so, go find that bus operator. In a blatant show of sheer prejudice and/or sheer arrogance, Defendant Dishaw  then said to Plaintiff, "Well, if you just admit to it, it will only be your first accident, and the kid wasn't hurt that bad."

Next, and then unbeknownst to Plaintiff, a Syracuse Police Officer who had been called to the accident scene, supra, filed a rather detailed report wherein he recounted (and then known to Patty dishaw) that Defendant Leo Williams, acting on behalf of CENTRO, arrived at Clary Middle school carrying five (5) CENTRO Bus Operator ID photographs, all, "black" man (one of which was Plaintiff) to be shown to the all eye-witnesses via a photo array line-up identification procedure. Not one child, including the victim, ever identified (i.e., picked out a photograph of) any black man that had been shown to them by Defendant Leo William, because the description of the bus operator, and known by Leo Williams, was "white"

21

NOTE: The Police report stated, and then previously known to Defendant Williams, that a vast majority of the eye-witnesses (all children) stated that the bus operator was *NOT* A **BLACK** MAN, but a "white man" or "white female" and/or "wearing a hat" thus, Defendant Williams decision then concerning Plaintiff and all other black bus operators, all, was a clear threat to his right (their right) to privacy and caused injury to plaintiff's reputation without due process.

Shortly thereafter, Plaintiff discovered that CENTRO knew that he had not been involved in said accident and, that said accident was caused by an "old time" operator because "old timers" were the only ones that knew that CENTRO's then bus series (the 800's) move forward (i.e., operate) if the back door lock (switch) was manually switched "off." Fortunately, and in a limited way, Waverly Faison then, somehow, and then believing that Plaintiff had not caused said accident, supra, made an independent check of Plaintiff's then assigned bus and determined then that the "switch" and/or "lock" had not be tampered with; thus, Plaintiff could not have been involved in said accident.

Noteworthy, also, is that (at trial) incontrovertible evidence will show that both Defendant Musengo and Defendant Leo Williams, both, tried to hide and/or suppress evidence of their then cover-up by depositing damaging information and legal documents in Defendant RMSCO's files (Note: Due to Plaintiff's ZEBRA TEAM having recently moved their offices, all, documented evidence mentioned herein, all, will be filed with the federal courts in the near future).

Years later, Plaintiff confronted Defendant Leo Williams with the above allegations. At first, Defendant Williams became defensive and immediately denied any raced-based involvement, whatsoever. However, after being told that incontrovertible evidence existed that could point to his guilt, Defendant Williams then, via an excited utterance, blurted out (in words or in effect) I didn't take 5 photographs of 5 black drivers to Clary, for identification, I only took 3, photographs of black drivers, and the police officer is a liar . . .".

Additionally false accident claims, by CENTRO, against Plaintiff, involved CENTRO falsely accusing Plaintiff of driving his "grocery charter" bus over the front lawn of a senior citizen's apartment building. According to the caller's accident report, the driver drove off without stopping to check for damage. Fortunately for Plaintiff, one of CENTRO's supervisors then, growing tired of seeing CENTRO's white supervisors trying to set Plaintiff up for discharge, warned Plaintiff that he was about to be falsely charged, again, with a false accident and, advised Plaintiff to, again, do his own investigation (the Supervisor then was Cornell Scott).

As a result, and once again, Plaintiff went immediately to the scene of the accident and, thereby, after snapping photographs of the deep tire tracts in the muddy grass and, then measuring the width and depth of the tire tracts and, after interviewing the supervisor of the senior citizen's home, Plaintiff then discovered that (1), his bus did not caused the property damage because according to the building's manager, the tire tracts had been made, earlier in the day, by a Niagra Mohark truck and, finally, (2), that the driver of the vehicle was a female.

The next false bus accidents were handled directly by Defendant Joe Degray whereby he then, via sheer racially motivated hate for Plaintiff (and same dislike for any independent thinking and/or college educated black man) falsely accused Plaintiff of having drove over CENTRO's grass and/or mud near CENTRO's gas pumps (after CENTRO's bus mechanics had set up (arranged) the accident scene). In fact, because all false accidents had then been dismissed against Plaintiff, Defendant Joe Degray then chose to arbitrarily, unlawfully, and/or personally, punish Plaintiff to demonstrate CENTRO's racial supremacy. [6]

As a result of Plaintiff having filed investigative findings, and reports, and complaints on the above matters of public concern supra, Defendants, again, on July 7, 1993, decided to switch tactics and use, and they did use, a white "male" bus operator to filed false, fraudulent, and misleading "damage to a bus" charges against Plaintiff; and, again, after conducting his own independent investigation, coupled with him filing a lengthy request for CENTRO's internal records of said accident, under New York State's Freedom of Information Law, Art. 6, the Plaintiff, on September 15, 1993, received a letter from Defendant Senior V.P. John Renock wherein he, faced with incontrovertible evidence of abject fraud on the part of his supervisors, and instead of offering an apology, he admitted to wrong doing, quite reluctantly, by stating:

---

[6] According to sworn testimony, given by former CENTRO supervisor, Gary Morris (an African American), in previous federal civil rights action, against CENTRO, Joe Degray was furious when CENTRO hired Gary Morris (and, simultaneously, hired another black supervisor named Cornell Scott). According to Gary Morris, Joe Degray approached a senior white supervisor and inquired as to why Gary Morris was hired over him. Apparently, Joe Degray thought that he, being white, made him more qualified as a supervisor than both Gary Morris and Cornell Scott. According to court transcripts, the Supervisor then promised Joe Degray that he would be the next person in line for a supervisory position, but at the time, CENTRO was looking for minority supervisors (transcripts, dated November 13, 1998 and January 7, 1999, on file under Gary Morris vs CNY CENTRO.

In addition, ZEBRA TEAM Investigators are in possession of an official (i.e., the originals) of documents wherein Joe Degray tried to discard and/or cover-up the "Racist" thought processes of white bus operators, against their African American passengers, all, found to exist on said white bus operators incident reports whereon Joe Degray's name and signature appears.

23

"On September 14, 1993, a meeting was held to review the alleged accident of July 7, 1993 . . .Present at the meeting were John Renock, Carl Baker, Craig Williams, Chuck Watson, and yourself.

At the meeting, you were informed by me that in the spirit of fairness the Company would grant you the "benefit of doubt" of whether or not an accident occurred and would not charge you with insubordination for not filling out an accident report when given a verbal order to do so . . .".

During same time frame, Plaintiff was introduced, by a bus operator name George Moran, to another bus operator named Andrew Martino, III (for purposes of this Civil Rights Complaint, both Moran and Martino are white) Mr. Moran, who was the elder statesman then, convinced Plaintiff to apply for permission to join the Union since, at that time, part timers were prohibited from joining the Union. Mr. Moran believed that Plaintiff being in the Union would, somehow, increase Plaintiff's chances of being considered for full-time.

In an around October of 1993, Plaintiff submitted his application for union membership, via a letter to Defendant Union, Business Agent, Chuck Watson, asking for permission to join the Amalgamated Transit Union, Local 580, of Syracuse, N.Y.

Defendant Chuck Watson then told Plaintiff, in-person, that no Part-Time employee bus operator had ever been allowed to join the Union and that before accepting Plaintiff's application for processing he had to first consult with the International President of Amalgamated Transit Union, located in Washington D.C.

On November 1, 1993, Plaintiff became the "first" Part-Time bus operator to join Union Local 580, supra.

At Plaintiff's first Union meeting, then held on Court Street, over a stripper's bar, Defendant Watson and Defendant Campbell, in an all out attempt to established their racial superiority over Plaintiff, all, based upon the Union's then awareness of Plaintiff's first amendment activities, supra, both Defendants then, in a consecutive manner of speech, told Plaintiff to "Sit down and shut the F-uck up," as he then stood up to speak on behalf of another driver, an African American that had been arbitrarily suspended, by Defendant Carl Baker, for having asked for a Union rep.

Next, Plaintiff caused a stir at CENTRO when, for the first time ever, Plaintiff caused/forced CENTRO to honor "part-time" bus operators for their year-to-year safe driving by having CENTRO issue, as was/is issued to full-time bus operators, a National Safety Council Safe Driver Award. Plaintiff was the first recipient of said award; the first being a one (1) year award (CENTRO refused to grant him retroactive awards), and his second ward being a seven (7) year safe driving award (Initially, the CENTRO and the

24

Union frowned on said award for "part-timer" until they discovered that Plaintiff had contacted the National Safety Council and, thereby, discovered that CENTRO and the Union, over the years, had been in error of denying said awards to any driver that had operated a bus safely for 400 – 600 hours, regardless of whether said driver was full-time or part-time.

Plaintiff also caused CENTRO official's and Union Official's hair to stand up (i.e., get a Don King Afro) when he submitted a written and verbal proposal to both the Union and CENTRO asking both parties to offer to the public a five hundred dollar (500) reward leading to the arrest and conviction of the individual and/or individual(s) then responsible for the brutal assault, robbery, and vicious stabbing of a bus operator, while he waited at the bus stop, located on Salina and Tallman Street, Syracuse, N.Y., to relieve a fellow bus operator. After both the Union and CENTRO refused to put up an award for a fellow bus operator and, after several other bus operators (black and white) had joined in with Plaintiff to help distribute the reward posters (fearing that they too could be the next victim), the Union and CENTRO then chose to joined in and the reward was increased to one thousand dollars (\$ 1,000.00).

While working as a Part-Time Bus Operator, Plaintiff chose to further increase his chances of being promoted to a full time bus operator by borrowing an idea from Defendant Joe Calabrese (former C.E.O., of CENTRO). The idea was in the nature of distributing a "Customer First" letter to bus operators, and/or the riding public, asking operators and/or the riding public to comment on CENTRO's service and/or bus operators. Plaintiff then (and for many years thereafter) gave out a seven (7) page questionnaire, together with a self-addressed stamped envelop, to all riding customers, at the end of his 3-4 months of driving them to and from their daily schedules, thus, asking said customers to Please comment on his job performance and, thereby, mail said questionnaire back to him, or to CENTRO. NOTE: Each and every questionnaire and/or customer letter mailed to CENTRO, on behalf of Plaintiff, all, mentioned (i.e., rated Plaintiff as being excellent in every single category).

On or about the fall of 1995, and/or shortly thereafter, Defendant CENTRO and the Union, instituted their first known official drug policy, under federal law, as a result of Plaintiff's then representation of former bus operator Dwight Williamson who then had been wrongly accused of using an unverifiable drug and, after said bus operator had published a series of true and rather damaging newspaper articles about how CENTRO and the Union, on-going, bitterly discriminates against black bus operators who ask and, thereby, receive effective representation from the Plaintiff and his ZEBRA TEAM first amendment advocates.

Union's unlawful unwritten decision and determinations in denying him promotion to full-time. In said

grievance, as here, Plaintiff challenged CENTRO's then decision to allow RMSCO, and/or a CENTRO employee, and/or their then representing attorney(s) to tamper with United States government mails (which someone did) by unlawfully removing Plaintiff's Workers Compensation Board's Appeal's papers, that had then been filed against Defendant attorney Michael O'brien (proof of tampering is available for review) In July 1999, Plaintiff successfully navigated former bus operator Evette Stenson's return to work after the Union and CENTRO then refused to reinstate her due to her then, long-term, on the job association with ZEBRA TEAM members as told, by her, in her discrimination report dated July 21, 1999.

On or about September 13, 2000, Defendant Union, via Defendant Homer Davis and Defendant Union's attorney Stephanie Miner (Plus all other participants in the unlawful discriminatory expulsion of Plaintiff) said Defendants then, in gross violation of state and federal laws, participated in a trial then known to them to have been constitutionally impermissible and based upon fraud, and/or fraudulent concealment, in that, neither Homer Davis, nor the Union's attorneys, neither, never signed the Homer L. Davis Investigative Report that was used by the Union and its Attorneys to gather support and, thereby, fraudulently convince union membership to prosecute Plaintiff and his two fellow first amendment ZEBRA TEAM associates.

Simply stated, each and every Defendant violated federal law, under Federal Rules of Civil Procedure (FRCP), Rule, 11, when they prosecuted the Plaintiff (and his then co-workers, Andrew Martino, III, and, Terrance Jackstadt) predicated on an unsworn and unsigned investigative report, all, after Plaintiff, in the union hall (which was caught on tape) gave both the Union and Defendant attorney Stephanie Miner, full, fair, adequate, and/or reasonable notice that any prosecution under the above circumstances would be constitutionally impermissible and, thus, null and void.

In sum, and just up to this point, from 1992, thru 2002, Defendants denied Plaintiff the opportunity to be trained and/or merely considered as a full-time bus operator because of his on-the-job, and/or off-the-job, constitutionally protected speech and employee grievance writings on matters of public concern; thus, both, CENTRO and the Union then chose arbitrarily, and/or unconstitutionally, to simply ignore any attempts by Plaintiff (i.e., legal wise and/or employee grievance wise) to compel them, either, individually and/or collectively to observe his liberty interest, under the due process clause, to engage in any of the common occupations of life, and/or observe Plaintiff's right, expressed and/or implied, under their CBA and/or under state and federal laws, to his legitimate claim, or entitlement, to have been promoted to a full-time bus operator position and/or same constitutional rights and/or opportunity to have worked, 30, 40, 50, 60,

26

or more hours, per week, like other part-timers have done in the past, and on-going, in excess of the CBA's limit of twenty five (25) hours. Board of Regents v. Roth, 408 U.S. 564 (1972)

## FACTS ON THE DEFENDANTS FRAUDS, BREACH OF CONTRACT; UNLAWFUL RETALIATION, AND/OR UNLAWFUL TERMINATION.

On Wednesday, October 10, 2001, the Plaintiff, due to his on-the-job injury that had previously thereto (almost 1 year earlier), occurred on August 17, 2000, telephoned Defendant's Workers Compensation Insurance carrier (Defendant "PERMA") and, in speaking on matters of public concern, complained to its then representative, Joan Mokay, about how "PERMA" and/or CENTRO had previously thereto (said phone conversation) been intentionally and maliciously, via fraud, and/or fraudulent concealment, discriminating against him by failing to fill out the Employer's Statement on the NY. State Disability forms so as to allow him to collect disability payment, pending the outcome of his Workers Compensation case.

Defendant PERMA (via "Joan Mokay") then instructed and/or induced Plaintiff to telephone Defendant's Benefits Manager, Defendant Jackie Musengo, immediately (i.e., that day) and, Defendant Mokay then also told Plaintiff to make an appointment to personally visit with Defendant Musengo because, according to Defendant Mokay , it was/is Defendant Musengo's legal responsibility (not PERMA) to complete the Employer's Statement on the N.Y., State Disability forms and then forward all completed "Employer Statement" disability forms to the employee's physician(s); or,

Alternatively, as Defendant Mokay then told Plaintiff, Defendant Musengo should have and/or could have sent the completed "Employer Statement" disability forms to the employee so as to have then allowed the employee's treating physician(s) to complete their section of said forms.

On same October date, supra, Plaintiff, immediately, telephoned another then similarly situated on-the-job injured ZEBRA TEAM co-worker, bus operator, Terrance R. Jackstadt, and told him about the above conversation. Both Terry Jackstadt and Plaintiff then telephoned Defendant Jackie Musengo and spoke to her via conference call (i.e, all three individuals, above, were parties to the following phone conversation)

Plaintiff (and Terry Jackstadt) then, again, speaking on matters of public concern, both, then complained to Defendant Musengo, about her then highly improper, discriminatory, and retaliatory treatment of their Disability Benefits, all, due to Defendant Musengo's then previous failure, via fraud and/or fraudulent concealment, to complete the Employer's Statement on their New York State Disability forms so as to have then enabled Plaintiff (and Terry Tackstadt) to collect monetary benefits, under our New York State's

Disability Law, pending an Administrative Law Judge's (A.L.J.) decision on their Workers Compensation cases both of which were then being controverted by the Defendants Workers Compensation Attorneys, Attorneys Woods and Richman.

Next, after the above colloquy between Defendant Musengo and Plaintiff ended, Defendant Musengo then told Plaintiff that if he wanted her to complete the "Employer's Statement" on the disability forms that he then had to come down to CENTRO, immediately, to pick up the completed "Employer's Statement"; and, further, Defendant Musengo then told Terry Jackstadt that the same "pick procedure" also applied to him.

Terry Jackstadt, however, then told Defendant Musengo that he was in too much pain to drive down to CENTRO. He then proposed, and Defendant Musengo then agreed, that the Plaintiff would pick-up Terry Jackstadt's (Employer's Statement) disability forms upon Plaintiff's arrival at CENTRO.

Defendant Musengo then informed both individuals (i.e., Plaintiff and Terry Jackstadt) over the telephone that the two (2) completed Employer's Statement disability forms, an extra copy for Terry Jackstadt, both, forms would be deposited, by her, in the Plaintiff's on-site employee mailbox (at CENTRO's headquarters)

Plaintiff then, induced by Defendant Musengo's expressed and/or implied agreement, and/or promise, to him, which he then relied upon, to his own detriment, Plaintiff then drove to CENTRO's headquarters to pick up the two completed (2) disability forms.

However, prior to Plaintiff's then arrival at CENTRO, Defendant Musengo, after hanging up the telephone, supra, she then immediately, with intent to unlawfully retaliate against Plaintiff (and Defendant Musengo did), on the basis of his race and/or on the basis of one or more of the activities enumerated in the statues, supra, contacted Defendants Frank Kobliski, and/or V.P., Rick Lee, and/or V.P., John Renock and/or V.P. Joe Degray and, thereby, via her then, long-standing, racially motivated invidious discriminatory animus, against plaintiff, concocted the following "baseless" "fanciful factual allegations", all, "describing fantastic or delusional scenarios" of Plaintiff being the big black "Boogie man." that was then coming to get her.

Next, Defendant Jackie Musengo, carried out her highly unlawful plot, supra, by by misrepresenting a material fact to one or more said Defendants, supra. That her misrepresentation, all, were knowingly, intentionally, deliberately, willfully, intelligently, voluntarily, purposely, maliciously, recklessly, and in "bad faith," carried out with a callous indifference and/or disregard to Plaintiff's then civil/constitutional rights.

Defendant Musengo effected her plot then by falsely, fraudulently, and/or misleadingly, telling Defendants that Plaintiff then had previously, over the telephone, harassed and/or threatened her and, as a result, she was afraid for her life and thus wanted something seriously done (and she did have something done) to Plaintiff when he arrived at CENTRO to pick up his and then co-worker Terry Jackstadt's completed "Employer Statement" disability forms.

As a result of the above, Defendants <u>Kobliski</u>, <u>Renock</u>, <u>Degray</u>, and/or <u>Lee</u> then, individually/collectively, upon hearing Defendant Musengo's false, fraudulent, and/or highly misleading allegations, <u>supra</u>, each Defendant then, individually and/or collectively, ordered Defendant Musengo to, unlawfully, retaliate against Plaintiff by placing (and Defendant Musengo did place) blank (i.e., non Employer's Statement) disability forms into Plaintiff's employee mail box so as to cause him to be denied and, thereby, suffer (and Plaintiff did suffer, <u>on-going</u>) deprivations of his state and/or federal constitutional rights to be immune from unlawful and/or arbitrary discrimination in receiving state and/or federal disability benefits and/or payments.

In furtherance of each Defendants unlawful plans, <u>supra</u>, Defendant Kobliski then delegated the power and/or authority to Defendant Lee, and/or Defendant Renock, to come up with (and each one did come up with) an immediate unlawful plot to legally, illegally, and/or pretextually violate Plaintiff's state and federal constitutional rights so as to cause Plaintiff (and said plot did cause him), to suffer, mentally and/or physically, a final and lasting impression of a serious physical assault on his body, upon his arrival.

In order to effectively effectuate CENTRO's unlawful plot, against Plaintiff, Defendant Renock then selected one of CENTRO's oldest and well known racist, Defendant Duke Bailey, an adult white supervisor to do (and he did) their dirty work for Defendants, <u>supra.</u>

Further, and in speaking with Defendant Bailey then (before Plaintiff's arrival), Defendants Renock, Kobliski, Rick Lee and/or Degray (individually/collectively then), either, in person, or by telephone, so as to place Plaintiff in a false light (which they all did) misrepresented the material facts to Defendant Bailey about what Defendant Musengo had then previously told them about her prior telephone conversation with Plaintiff.

The fraud, fraudulent concealment, and/or misrepresentation of the material fact(s), that were told to Defendant Bailey, by his superiors then, was that Yusuf Nuraldin ("Plaintiff") then was enroute to CENTRO to possibly harass and/or do bodily harm to Defendant Musengo.

29

Defendant Renock then delegated Defendant Bailey the unlawful authority to use excessive and/or sheer unnecessary force, direct orders then ratified by all Defendants (i.e., Kobliski, Lee, Share, and DeGray) to assault and batter Plaintiff (which defendant did) so as to evict him from CENTRO's property.

Unbeknownst to Plaintiff then, relying on Defendant Musengo's, expressed and/or implied, statements to him, supra, drove to CENTRO to retrieve the two (2) N.Y. State disability forms

Upon arriving at CENTRO, Plaintiff then went immediately to his on-site employee mail box where he retrieved two (2) *blank* N.Y. State Disability forms (i.e., the "Employer Statement" was blank). Plaintiff then, highly disappointed that the Defendant Musengo had, via fraud, actual fraud, fraudulent concealment, and/or unlawful retaliation, had chose not to fill out the "Employer's Statement" on the form, as she has done for other bus operators and bus mechanics (black and white) Plaintiff then decided to go into the driver's lounge to sit, talk, and wait for his co-worker friend, Andrew Martino, III, to get off from work. [7]

In the end, and upon seeing Plaintiff in CENTRO's lounge area, talking to bus operator Andy Martino, III, and others, Defendant John Renock then ordered Defendant Bailey to summon Plaintiff into CENTRO 's dispatch office whereupon Defendant Bailey was further directed, via cell phone, from Defendant Renock, to physically assault and batter Plaintiff after, pretextually, informing Plaintiff then that he then was no longer employed at CENTRO and thus he then had no first amendment constitutional rights to sit and speak with other drivers and, thus, was further prohibited from visiting CENTRO, forever. (see, attached affidavits of, just two (2) of the many eye-witness Bus Operator(s) to this incident: Andrew Martino, III, dated October 11, 2001, and November 9, 2001, as **Exhibit "A-1"** and **Exhibit "A-2"**); also see, certified affidavit of CENTRO Bus Operator, Samuel Johnson, under same MARTINO, III label, as **Exhibit "A-3"** also see, Plaintiff's own employee injury report, dated November 9, 2001, and, see, Plaintiff's Workers Compensation affidavit, dated October 24, 2001, attached hereto as Plaintiff's **Exhibit's "B-1" and "B-2"**

---

[7] It must be noted at this time that the Defendants carefully and/or specifically selected Duke Bailey for this assault case (i.e., excessive use of force case) due to each Defendants prior knowledge that Duke Bailey, throughout his tenure at CENTRO, had committed an uncanny number of civil rights violations (i.e., non-violent, or violent assaults and/or unlawful harassments against blacks, all, involving, whereas here, in Plaintiff's case, Defendant Bailey caused and/or committed against Plaintiff the following: (1) intentional infliction of emotional distress (2) extreme and outrageous conduct, intent to cause, or disregard of a substantial probability of causing, severe emotional distress (3) a causal connection between the conduct and injury ; and (4), severe emotional distress. (see, Howell v. New York Post Company, 81 N.Y.2d 115, 612 N.E.2d 699, 596 N.Y.S.2d 350 (1993).

SPEAKING ON MATTERS OF PUBLIC CONCERN, AND
IN "GOOD FAITH," PLAINTIFF, AND ANDREW MARTINO,
BOTH, CHOSE TO CONTACT DEFENDANTS' ATTORNEYS
THE "DAY AFTER" PLAINTIFF WAS ASSAULTED

On Thursday, October 11, 2001, Plaintiff and bus operator Andrew Martino, III, both then contacted Defendant Attorney Craig Atlas (CENTRO's then attorney) and told him of what had just happened to Plaintiff one (1) day earlier (see, Andrew Martino, III's, affidavit on this call, supra.)

At the conclusion of the above conversation, attorney Craig Atlas told both Plaintiff and Andrew Martino that he would take a look into their allegations.

On or about October 10, 2001, Plaintiff asked bus operator Andrew Martino, III, a friend, then co-worker, and a long-term TEAM ZEBRA team field investigator, to write a detailed letter then memorializing, under penalty of perjury (under 28 U.S.C.A § 1746) what he then had just then witnessed, if any thing, involving Defendant Duke Bailey's conduct on CENTRO's property while speaking with Plaintiff. Unbeknownst to Plaintiff then was that Andrew Martino, III, had also written a second sworn affidavit of the incident on November 9, 2001.

On or about the same day, Thursday October 11, 2001, Plaintiff, in good faith, personally called Defendant John Renock and reported the above assault incident and, thereby, told Defendant Renock that Defendant Duke Bailey had, in response to Plaintiff's question (on the day of the assault) "Duke! who told you to beat on me," that Defendant Bailey's immediate reply then was that, "John Renock told me to physically put you off the property, because you no longer worked here." And, "That you had no first amendment rights to hang around here, while out on comp, speaking to every one."

Defendant Renock then, however, and in a blatant show of sheer prejudice, actual fraud, a cover-up, and/or unlawful retaliation, responded by saying to Plaintiff, "That's ridiculous, and why should I believe you." [8]

---

[8]   It must be observed that Defendant Senior V.P., Renock has historically, over the years, uttered the exact same racially motivated sentiments "I don't believe you (black person)" and/or why should I believe you (black person), to all blacks who have complained to him, in writing and/or verbally, about racial discrimination by white employees. Proof, again, review the sworn deposition testimony of the federal case of Gary Morris vs CNY CENTRO, Inc.

Based upon information and belief, rumor then had it that Defendant John Renock, based upon the above, on Friday October 12, 2001 (two days after the assault) sent Defendant Bailey away to Florida, so as to be unavailable.

On same Friday, October 12, 2001, Plaintiff was seen and examined, by Doctor Howard, located at the Syracuse Community Health Center (SCHS). Doctor Howard then, via his Nurse (LPN), gave Plaintiff a "return to work" noted, dated 10/12/01, stating that plaintiff "will be able to return to work on 10/13/01" (Noteworthy: Doctor Howard has seen and examined Plaintiff for various ailments more than any doctor in Onondaga County and, the SCHC is where 95% of Plaintiff's medical records are on file (also, noteworthy, and subject to connection, is that Defendants have received a multiple of these same type of SCHC "return to work" slips from, Plaintiff, during his almost ten (10) year tenure at CENTRO.

On or about October 15, 2001, Plaintiff wrote a hand written letter to Defendant Musengo then traveled to CENTRO and, thereat deliver his "return to work" note to Defendant Joe Degray, whereupon Defendant Joe Degray then stated, after looking at the "return to work" slip, "Well, based upon what occurred last week between you (Plaintiff) and "Duke," we can't put you back to work driving until our investigation is complete, so, you'll have to wait, trust me! It won't take that long; get in touch with chuck he's been made aware of what's happening. You'll receive a call when you can come back to work, but right now you'll have to leave the property".

Next, Plaintiff, ultimately to his detriment, then chose to rely on Defendant Degray's then expressed and/or implied promise, supra, that he (Plaintiff) would be immediately retuned back to work, as a bus operator, or placed in CENTRO's "Light Duty Program" and/or "Early Return to Work Program" after CENTRO had completed its investigation. [9]

---

[9] Defendant Joe Degray unlawfully denied Plaintiff his state and federal constitutional rights when he, first, refused to return plaintiff back to work, if only for a day, upon receiving Plaintiff's back to work letter and, second, Plaintiff was denied same rights when Defendant Degray failed to consider Plaintiff for CENTRO's "Early Return to Work Program" as was done for former Bus Mechanic Jeffrey Thrall, in a letter dated March 21, 2002, which was carbon copied to said Defendant and also, copied to Defendants John Renock, Jackie Musengo, Mike Jablanski, Jr., and Defendant Union Local, 580. Thus, Plaintiff now challenges the Defendant to state, under oath, that any of Plaintiff's allegations herein are untrue.

Plaintiff, to his detriment, also then relied on the fact that Defendant Degray then never, not once, alleged and/or ever charged Plaintiff with having engaged in any prior misconduct, during the assault incident, supra, nor, ever alleged and/or charged Plaintiff with having then previously engaged in any misconduct at the Workers Compensation Bureau, as Plaintiff's subsequent termination letter had falsely stated and thus Plaintiff then (rightly or wrongly) had no reason to believe that he would be subsequently thereafter fired, via fraud, fraudulent concealment and/or unlawful retaliation.

More importantly, Plaintiff, to his detriment (and rightly or wrongly) reposed confidence in CENTRO and his Union and then reasonably relied and trusted in the Union's and/or CENTRO's superior expertise, or knowledge, under the leadership of Defendant Kobliski, that Defendants Degray, LEE, Share, and/or Defendant Renock's handling of said investigation would be fair, impartial, non-discriminatory, and/or non-retaliatory thus, thereby, exonerating Plaintiff of any and/or all possible misconduct.

Thus, and upon then believing in all the foregoing, Plaintiff then voluntarily chose to leave CENTRO's property, all, without ever trying to conduct his own independent investigation into said racial assault. Further, Plaintiff then, before leaving CENTRO's property, directly, walked over to Defendant Musengo's in-house office, and due to the fact that she then was not in her office, at the time, Plaintiff chose to scotch tape a copy of his "return to work" slip (which he did) onto Defendant Musengo's in-house personal office telephone receiver,

On October 16, 2001, Samuel Johnson, a long-term ZEBRA TEAM member and bus operator, also, wrote a statement detailing what he too had witnessed between Defendant Duke Bailey and Plaintiff seven (7) days earlier on October 10, 2001

Unbeknownst to Plaintiff then, as to the reason why he was not allowed, on Monday October 15, 2001, to return to work, via his doctor's note, was that Defendant, Kobliski, Defendant LEE, Defendant Renock, and/or Defendant Share, all, then were conducting a fairly massive racial profiling against any and all African American bus operators that were present during Defendant Bailey's physical assault on Plaintiff, six (6) days earlier.

The purpose of Defendant Kobliski's then race-based raid upon the African American community of CENTRO bus operators, all, was nothing more than a last ditch effort to find someone, anyone, that would tell a "lie," against Plaintiff, for Defendant Kobliski and, thereby, sign a false statement fraudulently stating that Plaintiff (not Duke Bailey) was the aggressor and, that Defendant Bailey was only defending himself.

To no avail, after all African American black bus operators were interrogated, by their white supervisors, senior vice presidents and/or mangers and, after all African American told the same story that Defendant Duke Bailey, unprovoked, had initiated the altercation and/or physical assault on Plaintiff, Defendants then chose to use pretext (and they did) to unlawfully terminate Plaintiff, per advice of Defendant attorneys.

On October 18, 2001, Defendants Frank Kobliski, Renock, LEE, Share, and Degray, all, with advice and consent from Defendants "BOD" and, with advice, consent, approval and/or complete ratification of Defendant Chuck Watson, and all other Union Executive Board Members, all, violated Plaintiff's rights to privacy and, thereby, committed fraud, actual fraud, constructive fraud and, fraudulent concealment, via Defendant Jablinski (former Employee Relations Manager) when they, all, unlawfully terminated Plaintiff, in writing, by misrepresenting a material fact then known by all Defendants to be false, fraudulent and misleading. Portions of Defendant fraudulent letter, dated October 16, 2001, bears repeating:

> Dear Mr. Nuraldin,
>
> " . . . "we (Centro) have been informed by the New York State Workers Compensation Board that you are no longer eligible to receive benefits because you have not provided them with medical information regarding the progress of your treatment for the injury."

All defendants, supra, including Defendant Miles G. Lawlor (attorney), and Defendants WCB Attorneys Woods and Richman, knew and/or should have known that Plaintiff had, in fact, just a few weeks and/or months prior to his unlawful termination, and all via Defendant's own Independent Medical Examiners, "provided the WCB with information regarding the progress of his treatment for the injury (i.e., whatever injury Defendants then were referring to).

On January 11, 2002, Defendant Miles G. Lawlor, committed s fraud on the WCB Courts when he filed a false, fraudulent, and/or highly misleading letter falsely claiming then that a WCB person named "Carolyn" informed him that Plaintiff's § 120 of the Workers Compensation Law would not be addressed at any then future hearing and, that "no such claim has been filed with the WCB . . ". (based upon Plaintiff's talks with a person named "Carolyn" of the WCB, she has no recollection, whatsoever, of ever having spoken to Defendant Miles Lawlor).

34

On January 22, 2002, and in total contrast to Defendant false and fraudulent termination letter, supra, the Honorable Justice, Mr. Charles Welch, Workers Compensation Law (WCL) Judge, told Defendants Miles Lawlor and Defendant Chistopher Richmond that Plaintiff (contrary to their letter allegations, supra, that Plaintiff was, in fact, entitled to receive "Benefit"

On or about December 2001, thru May 23, 2002, Defendant Unemployment Insurance Bureau (Department of Labor) and then having no jurisdiction of the following underlying issue (back to work letter) committed fraud and/or fraudulent concealment, which was relied on by Plaintiff, when said Bureau denied Plaintiff Unemployment Insurance benefits then falsely and fraudulently claiming that Plaintiff then had "failed to provide medical documentation to show that you are physically able to perform work."

On or about Friday November 4, 2005, Plaintiff was denied access to the Courts, as a process server, and as a non-party, interested person, under New York's Civil Practice Law and Rules (CPLR) § 5051, et. seq., in violation of his state and federal constitutional rights.

On or about Wednesday November 9, 2005, Plaintiff was denied same access to the Courts, supra, when he was denied his state and federal constitutional rights to speak on matters then involving Defendants fraud on the courts and Defendants filing of false, fraudulent and misleading affidavits against Commissioner Edward Garrow of the FMCS, supra.

<u>SUMMARY AND/OR LAUNDRY LIST OF DEFENDANTS' BREACH OF
CONTACT VIOLATIONS AND DEFENDANTS EGREGIOUS VIOLATIONS
OF STATE AND FEDERAL LAW COMBINED</u>

(a),  Plaintiff was denied the opportunity to train, with pay, for full-time Bus operator. In a false statement to N.Y State Division of Human Rights (1998) Defendants attorneys falsely wrote that Plaintiff had then previously refused full-time because he was in law school.

(b),  Plaintiff, also as the # 1, seniority pick in his class, was denied his right, privilege, and/or immunity under the CBA to be recommended and/or "interviewed," by the Union, and/or CENTRO for full time bus operator as was Plaintiff's class-mate Defendant Joe Degray, who, incidentally, was far below Plaintiff in seniority.

(c),  Plaintiff was denied his opportunity, as a "Part-time" operator, to earn full-time pay, with over-time benefits, and thereby receive medical benefits, from ROCCO Insurance Company as was granted to "others" (a white woman, in particular, initials D.L., (now-full-time) by working (i.e., driving his bus, or doing other odd jobs) in excess of twenty five (25) hours, in gross violation of the CBA's rules on the limited amount of hours (25) that part-time bus operator could work, per week, i.e., excluding special events.

(d),   Plaintiff over the years was denied the right/privilege and, thereby, disciplined for getting off his bus to use CENTRO's bathroom, as "others" did (specifically white bus operators were allowed to use the bathrooms) located  inside CENTRO's Regional Transportation Center ("RTC") where public transportation such as Grayhound buses arrive and depart daily.

(e),   Defendant Musengo, CENTRO's then Employee Relations Manager, after she suspended Plaintiff, without pay, for going to the RTC bathroom, supra and, in the presence of then Union President Dorothy Hunter and CENTRO's Security Chief, told Plaintiff that ONLY white Centro bus operators, traveling long distance bus routes, were permitted and/or had prior permission to get off their buses at CENTRO's RTC Center to stretch, get coffee, sodas, and/or food, etc, etc, and/or to use the public restrooms.

(f),   Next, Plaintiff, upon contacting CENTRO's dispatcher to report that he had a serious nose bleed, from the bus fumes, while operating a charter, approximately one (1) hour away from CENTRO headquarters, Plaintiff then was told by CENTRO's dispatchers NOT to call an Ambulance but instead try to operate his bus safely back to CENTRO's garage. Plaintiff's elderly passenger's then snatched the bus phone from Plaintiff and yelled expletives into the phone at the dispatcher and, thereby, they called the ambulance, whereby, Plaintiff then was admitted into the hospital (had Plaintiff been white, CENTRO's dispatchers would have immediately, as they have done so in the past, called a for an ambulance (Unfortunately, one Black bus operator (Benny Scott) died from a heart attack that he suffered (from a severely cold bus) because CENTRO's white dispatchers/supervisors then would not give him "another" then available "warm" to drive, on a day, during almost sub-zero temperatures

(g),   From in or about February 1992 until February 2001, Defendants Darrell Vanderpool and or Jerry Deitz (now deceased), made use of filing false statements and/or false business records, all, relating to false bus to car accidents, against Plaintiff, in retaliation for him having then exercised his first amendment rights to speak on matters of public concern, as he did, in reply to the following falsehoods

(h),   Defendant Ellie Ruston (a new defendant) and Defendant Jerry Deitz both used a white male bus operator, named Flemmings, to falsify a bus-to-lamp post accident, against Plaintiff; however, then unbeknownst to both Defendants, supra, Plaintiff always carried a camera and video equipment so as to document CENTRO's daily unlawful employment practices and, said photos of Defendant Ruston and Deitz's frauds then, ultimately, caused Defendants to admit to said fraudulent acts and, thereby, dismiss their false charges against Plaintiff

(i),   Also, Defendants used a private citizen, a Blackman, to stage a bus-to-car accident; however Plaintiff's on-the-scene photo's showed that Defendants' Supervisors Jerry Deitz and Darryl Vanderpool, both, had moved the previously "staged" automobile up to and directly parallel to Plaintiff's bus, then took the false accident photographs, all, so as to make it appear that Plaintiff had side swiped a "previously damaged"automobile (Unbeknownst to Defendants then was that several Syracuse Fire Fighters, then on the scene, for an unrelated incident witnessed Defendants Jerry Deitz and Darrell Vanderpool's false reconstruction of a fake bus-to-car accident and said the fire fighter (a Lieutenant) and his colleagues, plus a C.O.P., Citizen on patrol ticket officer, all, also over-heard both Defendants conversations on this involving insurance fraud. As a result, the Lieutenant fire fighter subsequently thereafter, at the firehouse, gave Plaintiff his telephone number and a written statement of the incident.

(j),  Fraud, fraud on the court, constructive fraud, actual fraud

(k),  Fraudulent Concealment

(L),  Breach of Contract (N.Y.C.P.L.R § 213(8)

(m)  Breach of fiduciary duty
(n),  Tortious interference with contract

(o),  Legal malpractice, by Defendants Attorneys

(p),  Unlawful discriminatory employment practices, via the use, misuse, waste
      and egregious abuse of state and federal funds

(q),  Denial of access to the Workers Compensation Courts, in violation of
      N.Y. State Worker Compensation Law § 120, Discrimination; and,
      Denial of Plaintiff's federal constitutional rights to Equal protection of
      the law, due process of law, procedural due process, equal right under the
      law, and Plaintiff's state and federal constitutional rights not to be
      discriminated against in exercising said rights (see, Commerce clause,
      supra.

(r)  Unlawful conspiracy and/or denial of access to the Courts as a non-party,
     interested person, and/or process server, based upon race-discrimination
     via, in violation of N.Y. State's C.P.L.R. § 5015(a)(3)(4) and, in violation
     of 42 U.S.C. § 1983, and/or fraud, under C.P.L.R. § 213(8) (also see,
     Commerce clause, supra.

(s)  Defendants committed Fraud on the court, and misused state and federal
     funds to engage in, promote, manage, direct, ratify, and/or fraudulently
     conceal, unlawfully, a cover-up concerning Commissioner Edward Garrow
     Mediator, of the Federal Mediation Conciliation Services (FMCS), his
     non vote and/or non-final determination, at the Defendants CENTROs and
     the Union's Grievance Review Board ("GRB") held on August 19, 2003,
     for two former "terminated" and "disabled" CENTRO Employees named
     Jeffrey THRALL and Amos BURDEN.

(t)  At the Court's discretion (i.e., if demonstrated by the evidence at trial)
     Plaintiff alleges that all Defendants, individually/collectively violated
     the Federal Racketeering Influence and Corrupt Organizations Act
     ("RICO"), under 18 U.S.C. § 1962, within the applicable statute of
     limitation period for fraud and/or civil and/or criminal acts

(u)  Egregious breach of contract because Plaintiff was denied due process and
     or denied procedural due process, under the CBA, i.e., the right to fair
     Notice and/or adequate notice of the charges filed against him that were
     the basis for his termination, and a pre-termination opportunity to confront
     the witnesses against him and, opportunity to respond to the person making
     the termination decision and, a subsequent "evidentiary" hearing regarding
     the termination (with reinstatement is Plaintiff prevailed; a name clearing

hearing; the right to respond in writing <u>Mathews v. Eldridge</u>, 424 U.S. 319 (1976); <u>Regents v. Roth</u>, 408 U.S. 564 (1974); <u>Arnett v. Kennedy</u>, 416 U.S. 134 (1974), and also see, <u>Goldberg v. Kelly</u>, 397 U.S. 254 (1970)

(v)   according to a "taped" conversation between Chuck Watson (Union CEO) and a former unlawfully terminated female employee, Defendant Watson said in a "taped recorded" telephone conversation that Defendant Kobliski "mico manages" CENTRO and, thus, Plaintiff alleges that said Defendant was involved and/or had personal control of each/every pre-termination and/or post-termination investigation and/or decision and determination, including any and all unlawful WCB plots, against Plaintiff, which caused Defendants to unlawfully discharge Plaintiff without due process of law and/or without affording him his fundamentally guaranteed rights under the CBA 's procedural due process clauses/non-discrimination clauses

(w)   Denial of Plaintiff's right and/or privilege, under the "CBA" to have had his "disability" brought, heard, and/or considered, by the Union/CENTRO at Defendants' Grievance Review Board ("GRB"), as a "terminated" and or "discharged" employee, with a disability, as was afforded to two (2) other similarly situated "terminated" and/ or, "discharged" employees, with "disabilities; "namely, Jeffrey Thrall, a "white" male former Bus mechanic and Amos Burden, bus operator and, an African American male; (and, again, both men "terminated" and also then "disabled")

(x)   Plaintiff was denied his right via actual fraud and fraudulent concealment to collect N.Y. State Workers Compensation Benefits (monetary and/or medical) due to the Defendants unlawful and fraudulent conduct of filing false, and/or misleading reports to the Workers Compensation Courts stating that Plaintiff's injuries "did not" arise in and out of the course of his employment while, simultaneously, filing entirely different reports to the <u>ZURICH AMERICAN INSURANCE COMPANY,</u> that Plaintiff's: *"disability arose out of and in the course of your employment. We suggest you notify your employer and obtain a claim for Workers' Compensation (Form C-3) from the nearest Workers' compensation Board Office."* (This fraud was carried out on 11/25/02, so as to, simultaneously, deny (and said misleading reports did deny, <u>on-going</u>, Plaintiff his N.Y. State disability and worker compensation benefits)

Respectfully submitted

Yusuf J. Nuraldin, <u>pro se</u>,
P.O. Box 151
Liverpool, New York, 13088

Due to serious time constraint, this Amended Complaint will be re-filed, pursuant to Rule 15, and each paragraph will be numbered. Sorry for the inconvenience.